Good morning. We are presenting two issues here. First is the degree of deference, and we believe that is due an arbitration decision that strays off the reservation where he goes out and begins writing his own contract and taking away rights that exist and adding rights that don't exist from a contract. The second issue that we're raising here is a question of due process, whether, in fact, Arbitrator Nicolau's decision was really nothing more than a settlement, a four-party settlement agreement couched as an arbitration decision. And that arises from this strange hearing that occurred on March 30th where Arbitrator Nicolau goes off the record and apparently at some point may have gone doubly off the record to have both at some point no record at all. Both of those issues, we think, raise serious questions as to whether or not this arbitration decision should be enforced. We think, in particular, that the fact that this came up on a motion to dismiss rather than after any form of discovery, any form of evidentiary hearing, any form of sort of procedure. How would you have discovery or an evidentiary hearing on review of an arbitration decision? Well, Your Honor, there are two ways that I can see that. First, on the due process issue where what happened at the Sub Rosa hearing is an obvious — Well, counsel was there. Counsel for all four parties was — were there. Not counsel for the appellants. Not counsel for the — not counsel for appellants. Appellants — Now, wait. The individual appellants? The individual appellants had no — weren't — Well, they were represented, though, by their union, correct? That would, of course, raise — that raises an issue of duty of fair representation. In fact — Well, they were the parties to the arbitration with those — with those four entities, the two unions and the American and the Eagle. That's right, but — And isn't — isn't this discussed in the arbitrator's award at page 10 where he talks about having this meeting with counsel and says, the award that follows is my award. It does not represent the agreement of any of the four parties. Isn't — doesn't he describe that meeting there at page 10? Well, he describes the meeting in a summary fashion, but I think that when you look at the actual — Well, my question is, isn't that the meeting he's describing at page 10 of his award? Yes, it is. Right. But he's — but the question is, what occurred at that meeting? The question is, what evidence did he take at that meeting? The question is, what is he relying on? And the question is that when the gentleman says, this is a not — I am not simply — Maybe these individuals should have sued their union. Well, that's the whole issue, Your Honor. They could have — if they had known about this and been informed about that, that might have been a possibility. But the first — But he didn't know about it. He describes it at page 10 of his award. No, he described that he received some information, and that information apparently related to the layoff of pilots in the interim. What he didn't know was what occurs in the transcript, which we ultimately got, was that they actually discussed at this meeting a settlement proposal that the four parties had previously discussed over dinner the prior evening. It's that element of it that makes it different. In other words, it's one thing to say, I learned information at this hearing about a layoff of 104, 102 pilots that had happened in the interim, and that's certainly the implication that it has there. That what is a different thing when you have a — when you see the actual transcript, which we didn't see until much later, where it looks like he's going off the record to discuss the facts of the case, other details, what the parties — Is that what you're saying? Yes. The individual pilots saw the transcript. We don't have a standing problem here where you have individual pilots challenging a labor arbitration award that their own union is defending? No, we don't, Your Honor, because we believe under the Railway Labor Act or the airline — and its application to the airline industry that individual pilots have standing to object to the content of arbitration awards independently of their union. And that's, I think, reflected in the fact that both under the Railway Labor Act provisions, as well as their adoption in parts of the airline carrier — Don't we have a CBA? We have a CBA. Under the Railway Labor Act? Yes. Which gives the union the exclusive right to pursue arbitration on behalf of the aggrieved employees? No. The actual language, I believe, in the statute is that the system arbitration board, which is basically a system adjustment board, which is basically what this process would be, would allow employees to resolve disputes among employees and does not necessarily give the union exclusive rights. I would note the union has not to this date raised standing as an objection. And if that were an objection, I would have thought that I would have seen it in some of the papers that would have been filed either here or in the district court. Of course, we decide jurisdiction. We don't need someone to suggest it to us. I find it interesting that in this, what they call a letter brief filed by the Allied Pilots Association, which I understand represented the American Airlines Pilots — That is correct. They say, therefore, although the APA does not agree with all of the appellant's assertions, including the assertions that arbitrated Nicolau violated their due process rights. So even the Allied Pilots Association bailed on you on that one. They didn't file a brief, but they made it clear they don't think there's a due process violation. Well, Your Honor, if this is what we think it is, namely a four-party settlement couched as an arbitration, why would they disagree? You know, this is, as we expect — I agree about some of his aspects, but it's — No, Your Honor. I mean, some aspects. Don't know what those are. Does he — my guess is that they objected to the 35 that he allowed to go, you know, ahead of the TWA's pilots. That would be my guess as to where they're objecting to, but that might be all of it. They may have other problems. They don't say, so we don't know. But I think our problem with the due process point is just that if this is a sub rosa settlement, then of course the party's not going to tell you about it. Now, whether or not this gives a right to sue the union for breach of duty of fair representation is an interesting question, but our position is that you can't get there under the Railway Labor Act until you at least first go through an effort to try to set this award aside based on either the due process or the errors that the arbitrator made in his arbitrary division of pilots, his arbitrary changing to the letter three, the flow-through agreement. In other words, our position is that that's the remedy that is appropriate to first address. In other words, ideally . . . Well, just to finish up on this due process issue because the district judge doesn't address it in his opinion, and in fact, you didn't specifically assert it in district court other than reference it. Is that correct? That is correct. It was referenced in the fact that we raised the issue that there was a decision by Arbitrator Nicolau that bore significant resemblance to other settlement proposals that had previously been made. Your Honor, you did not specifically assert a due process violation in district court akin to what you're asserting now. Expressly assert. No, Your Honor. We would have had to amend the complaint to have done that. Had the court felt that this was . . . had the court given us the opportunity to amend, that would have been an appropriate thing to have done. I would advise . . . I mean, if you look at the procedure in the district court, the motions to dismiss were sort of filed and then not ruled on for a very long period of time, during which there were a number of status conferences where additional information was sort of provided. Our view of it is, of course, that those become part of the record when the court ultimately reviews the motion to dismiss. My view is that we raised this sufficiently for . . . pro se parties raised this sufficiently so the court should have at least given the parties an opportunity to amend. Even if to say that this is a complicated case, get counsel, have them look at it, think of what to amend. They should have at least had that opportunity to know that if they wanted to proceed in district court, they should have had an opportunity to amend and what that amendment might have done in district court, enough so that I think that it is appropriate to have given my clients an opportunity to amend in district court to see if they could state a better claim or claim that was more clear to the judge. So, Your Honor, I think that in the procedural posture of this case, it is important to remember that this is coming up without an opportunity to amend on a motion to dismiss. I think that's an unusual situation and while I recognize the court's earlier remark about, you know, why do you need . . . you know, this is a review of an arbitration decision, this decision does a number of things which are complicated enough so that some sort of evidentiary explanation would not be . . . would be appropriate. In other words, how does he divide the American pilots with seniority numbers into two groups? It is an arbitrary line drawing. Why does one group have to sign an irrevocable election, but the other group does not? There's no explanation for that. The only explanation given by the court . . . by the arbitrator is an interest in finality, but the interest in finality is undermined by his creation of new rights for over 800 pilots at American Eagle who had no flow-through rights. So, not only did he not create finality, he extended to a new son-of-letter-three agreement for these pilots. So, I think that, candidly, there was . . . there was plenty of reason to think that a discovery and factual development would have been appropriate in order to show not only what he did, but the impact that this had on American . . . on . . . What's the ultimate relief you're seeking from us? Well, Your Honor, obviously, I would like the court's remanded with directions to vacate, but my guess is that the appropriate relief that the court would grant is remand with a direction to take further proceedings, allow an amended complaint if necessary, and conduct further proceedings as appropriate for the case. Now that . . . now that the plaintiffs have counsel? Yes, Your Honor. You know, that was their election. They proceeded pro se in district court. Well, Your Honor, I . . . I recognize that, and I guess go back to the they would have selected counsel at that point and realized the gravity of the situation. Now, when you say had been given an opportunity to amend, did they move to amend and that was denied? No, Your Honor, but I think that on a motion to dismiss where we're dealing with the initial complaint, I think that a district court would normally grant leave to amend, or at least ask the parties, in particular if they're in pro se, if they would like an opportunity to amend, and at least give them the opportunity to answer that question . . . . . . on review of an arbitration decision under the RLA, which is extremely deferential? Well, I think, Your Honor, even more so under that condition because the extreme levels of deference don't . . . it seems to me appropriate that they be given an opportunity to state their best possible case in light of those limitations and deference of review. That seems to me that that's a reason to grant an opportunity to amend so that one can be sure that one is doing . . . that the parties have every opportunity to do it because, after all, it is a stiff standard. I understand that, and that seems to be argued for giving that opportunity. Counsel, in response to the question about what relief or remedy are you seeking, are you asking us to vacate the remedy ordered by the arbitrator? I believe, Your Honor, it would have to be remanded to the district court with instructions to do that if that was as far as the court would . . . Instructions to vacate it? Yes. I don't believe this court would be able to do that. What would the effect of that be when you have so many pilots who have already been hired pursuant to that remedy? Well, Your Honor, I think they were hired pursuant to the flow-through agreement. I don't think that they would have any impact on those. It would have to go back to a further hearing in front of the arbitrator. That would be the normal course would be the case would be remanded back to the arbitrator by the district court. In other words, this decision would be vacated. The case would go back to the arbitrator for further proceedings. That would be the way I would envision this working. Those hirings, in your view, were separate and apart from any award or remedy ordered by the arbitrator? I think that those people would have been hired, but that's an issue that could be investigated by the arbitrator in formulating another award. After all, vacating this award would not necessarily impact anything until the arbitrator makes another decision. The arbitrator can take evidence on all those issues and decide it on the basis of a record and facts. If there are interim events that would have impacted the case, that would be something appropriate for arbitrator to do on a remand. It would not be appropriate, I think, for the district court to do it, but it could, I suppose, but it would be more appropriate for this decision to be vacated by the district court and remanded back for further proceedings in arbitration. That would be the way I would envision a remedy. The core of this remand is the due process argument that you're making? I think that when we remand it, there would be that we would add the due process. I'm saying, you're asking the panel to grab a hold of a due process argument as the central fuel for a remand with instructions to vacate a due process claim, which was not expressly pushed forward, but which you're asking the panel to grasp and fuel the vacation. Is that what you're arguing? No, Your Honor, that's one of our arguments. The other argument we spent more is that we believe that on its face, this decision exceeds the jurisdiction, the bounds of an arbitration decision because it creates rights, destroys rights, and is not drawing its essence from the contract. What's your best case for that argument you just made? My best case for that, Your Honor, is this, that in Nicolau's award . . . I don't mean your best case as in your best argument. What's your best case that's printed, decided by some court that is anchored to the argument you're making to us? Well, I think that the Delta Queen case in this court talks about the arbitrators exceeding their jurisdiction when they stray away from the justice. That phrase, of course, industrial justice . . . So your core or principal argument is still tethered to the arbitrator exceeding his authority? Yes. That's your main argument? Yes, that is my main argument here, but the due process argument is a part of our . . . is the second argument that we're making. I know we've got several different agreements in issue, the CBA, the flow-through agreement, some other things. What specific provision was violated by the arbitrator? Well, Your Honor, the arbitrator . . . okay. Under the flow-through agreement . . . I don't believe you cite one in your brief, do you? What, a specific provision that was violated? Yes. What is it? The specific provision they violated were the seniority provisions set out in the flow-through agreement, in the hiring provisions. Under the flow-through agreement, Eagle Pilots got to America in under two ways. First, they would be hired one-for-one with any new hire class. If they were unable to . . . if they were held back because of a training freeze, that's a training freeze at Eagle, and that means we've trained you on this equipment, you have to fly for a couple of years before we're going to allow you to go to America. If they're held back, then they have absolute priority over everyone else in a new hire class. What happened in the arbitrator's decision is he basically said 35 of . . . there were 244 positions that should have gone to American Eagle Pilots. Of those 244 positions, only 35 are going to now go to American Eagle Pilots. The remaining positions are going to go, first, after that 35, first to 102 people who had been laid off and who had recall rights under a separate agreement. In other words, not the flow-through agreement, but under a different agreement, under a two-party contract. Then the arbitrator said, at that point, then hiring is going to be done by American Eagle . . . sorry, by American Airlines seniority. In other words, not under the two for . . . the one and one, or under the absolute priority of the two provisions that were provided for in the flow-through agreements in Sections 3, I believe it's 3A and 3D, or 3B and 3D. In other words, he basically eviscerated both of the procedures for moving from American Eagle to American that the flow-through agreement provided in favor of an overall American seniority, which, as we've explained in the brief, gave the TWA state police the opportunity to move ahead of the American Eagle Pilots. In that sense, he basically eviscerated the contract and took away the important transfer rights, either the one for one or the absolute priority, if you had an operational holdback, that they were entitled to. In that way, he violated the agreement. He then created a new agreement by giving 846 Eagle Pilots who had no rights, all of them, and at what . . . you have to ask yourself, well, what was the consideration for that? Why did he do that? All right, Counsel, are you still answering Judge Barstow's question? I'll continue to argue in your case. Or have you shifted into . . . I apologize. I know you carefully didn't put any commas, you know, in all that, but I think you've answered it. If not, you've reserved some time for Buttle to come back up and polish off your argument.  Thank you, Your Honor. I'm representing American and American Eagle, two of the four parties to the flow-through agreement. Counsel for Alpa is present to answer any questions that the Court may have that are specific. All right, Mr. Fritz, I need your stage voice, something about maybe my flying, no pun intended, my ears haven't opened back up good, so just give me your good stage voice and I won't have trouble.  No apologies, just, you know. I would like to make two points about the award itself. The first is that every one of the 244 affected Eagle pilots was offered a remedy. The remedy was the opportunity to flow up to American with retroactive service credit and benefits going back to the date they would have transferred to American in the 2007 to 2009 time period. The arbitrator expanded this remedy to include an additional 42 Eagle captains who had greater seniority than the least senior active former TWA pilot. Appellants do not dispute that every one of the Eagle pilots who elected to flow up pursuant to the award did in fact flow up. They complain that the award, that the flow-ups actually happened sooner than that had been projected. They, in their brief, they say that those flow-ups happened by May 2011 rather than 2012 or 2013. So the appellant's complaint about the award is principally one of timing. In some respects, they... Counsel, you agree with Counsel for Appellant that there is no problem with standing with these individual pilots challenging an award that the union is defending. We don't have a standing problem. Your Honor, under the court's decision in Mitchell, this case could be disposed of on standing grounds. Well, he said that the distinction between this and Mitchell is he said that the CBA here doesn't give the exclusive right to the union to pursue arbitration. I think that's the distinction he drew. Is that right? The flow-through agreement in paragraph 6 makes clear that the parties to the agreement are the four parties, American, EGLE, ALPA, and APA. The standing issue was not raised below because we were litigating essentially two cases, this case and the Stewart case. In the Stewart case, APA, one of the four parties, had filed a cross-claim to vacate the award. We, meaning American, EGLE, and ALPA, sought to consolidate Stewart and McKenzie and have one decision on both cases in a consolidated fashion. The district court did not consolidate, ultimately issued two separate decisions, and so now we're presented with McKenzie by itself, and the Stewart decision has not been appealed. So the question is, do these individuals have standing in this appeal? Under Mitchell, I think there is grounds to say that they do not have standing as a matter of law because ALPA is their representative for purposes of the flow-through agreement. So timing aside, there is no dispute that every one of the 286 EGLE pilots who elected to flow up received a remedy, including retroactive service credit and benefits. The second point I'd like to make about the award is the argument that the appellants have raised that the arbitrator should have displaced American pilots in order to make room for the EGLE pilots who elected to flow up. This goes to the purpose of the flow-through agreement. The flow-through agreement has two essential purposes. The first is to provide job opportunities for EGLE pilots at American. This is the right to flow up in Section 3 of the agreement. The second purpose is to provide jobs at EGLE for American pilots who are furloughed from American. This is the opportunity to flow down in Section 4 of the agreement for these purposes. It allowed 244 EGLE pilots to flow up to American, but it did not result in the furlough of any American pilot. Arbitrator Nicolaus stated at the outset of the remedy hearing that American pilots should not end up on the street as a result of his award. This was consistent with the purpose of the flow-through agreement, to make room for EGLE pilots. An arbitrator's award is entitled to deference as long as it draws its essence from the party's agreement. This means that the award must be rationally inferrable from the letter or the purpose of the underlying agreement. This court has held that the arbitrator's selection of a particular remedy is entitled to even more deference than his reading of the underlying contract. The remedy lies beyond the arbitrator's jurisdiction only if there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract. The remedy award in this case was a logical means of furthering the aims of the flow-through agreement. It provided job opportunities at American for every one of the 244 affected EGLE pilots, and it did so without causing any American pilot to be furloughed as a result of the agreement. Delivering large numbers of EGLE pilots to American all at once would have resulted in substantial operational problems for EGLE. This was a legitimate consideration that was consistent with the terms of the agreement. The agreement provides that the right to flow up may be delayed due to EGLE's operational constraints. The EGLE pilots continued to be employed at EGLE until they transferred to American. They received service credit and benefits retroactive to the date that they would have transferred in the 2007 to 2009 time frame. This was an invaluable and meaningful remedy, and every one of the 286 pilots who elected that remedy got it. I would like to address the due process argument as well, and I think the answer to the question on the merits of the due process claim, Judge Barksdale, as you noted in your question, is really that the four parties to the agreement are ALPA, APA, EGLE, and American, and those four parties consented to the off-the-record discussion. The individual pilots had no right to be party to the remedy proceeding. They had no right to be party to the off-the-record discussions. The off-the-record discussions were, as you noted, referenced in the award. They were referenced in the transcript. The best evidence that the award was not a settlement agreement in disguise is the fact that first, the arbitrator said it wasn't. He said it was his award, and second, one of the four parties to those discussions, APA, filed a cross-claim to vacate the award. So, as a matter of law, it is our position that there was no due process violation because all four parties to the agreement were present during those off-the-record discussions, and the off-the-record discussions were noted both in the award and in the transcript. With respect to the Delta Queen case, the Delta Queen case is really a case going to the merits of an award. Ultimately, as this Court has held in the TimeKate Studios case, an arbitrator's deference, particularly in fashioning a remedy, is entitled to even more deference. And as long as the arbitrator is faithful to the purpose of the agreement, which arbitrator Nicolau was in this case, the arbitrator is acting within the scope of his authority. So, the TimeKate Studios case is a very appropriate example of the scope of an arbitrator's authority to fashion an appropriate remedy. Lastly, as to the question as to what specific provision of the agreement did the arbitrator violate, the arbitrator did not violate any provision of the flow-through agreement. The arbitrator ultimately allowed, consistent with paragraph 3D of the agreement, the Eagle pilots who elected to flow up, the right to flow up, in order of American Airlines seniority. The arbitrator was presented with a situation in which there were American Airlines pilots, as well as Eagle pilots, with American Airlines seniority numbers in that group. But every one of the Eagle pilots had the opportunity to flow up in order of their American Airlines seniority, pursuant to section 3D of the agreement. Under section 3D, the operative term is American Airlines seniority, and allowing American Airlines pilots to occupy positions as well in order of seniority was consistent with the purpose of the agreement. It was consistent with the fact that the arbitrator was presented with a situation where there were former TWA pilots who had been furloughed, who had seniority numbers in that group, as well as what I'll refer to as legacy American pilots in that group who had seniority numbers. But the arbitrator acted consistent with paragraph 3D of the agreement in allowing pilots to occupy positions in order of American Airlines seniority. That is as distinct from paragraph 3A of the agreement, which is really a one-for-two provision. This was not a one-for-two remedy. This was a one-for-one remedy for the 244 positions that had been occupied by the former TWA pilots. So unless the court has any other questions, that is all I have for the court in terms of my argument today. Let me just ask you, remind me, I know it's in the papers, but just remind me of how the off-the-record conversation occurred. Not how, but what spurred it to come on. Your Honor, if I could give you a somewhat long version of an answer to that question, because what the arbitrator did at the outset of this process was to announce some preliminary rulings, including the ruling that he did not want to displace any American pilot, put them out on the street in order to implement this remedy. And then what happened over the course of the February hearings, as well as that March 30 hearing, was an effort by the arbitrator to narrow the issues. And so when it came down to the March 30th hearing, if you read the transcript, it's clear that the parties were, first of all, very far apart on the issues that remained, had very sharp disagreements, and the parties were very careful, as the transcript reflects, to put into the record any evidence that the parties thought was relevant, including other arbitration awards. And then ultimately, once all that evidence was in, the arbitrator, with the consent of the four parties, went off the record in order to discuss what issues remained for the arbitrator to decide what the party's positions were, really in order to narrow and clarify the scope of the issues that . . . I'm trying to analogize, as I understand it in context. In a trial setting, it's quite notable, the trial judge may have all the lawyers in, you're in the judge's chambers, or if it's in the pretrial conference stage, it's not unheard of, the judge has the parties, everybody's in here, so, okay, let's narrow it down. I'm not letting you call 50 witnesses on this point. Who are your seven you're going to put on? This happens all the time. I'm not suggesting the arbitration is the same as the judge, but it's not when you've got a complicated matter, to have these conversations occur, yada yada, presuming everybody's present. I was trying to just get context for whether this was one of several or part of an ongoing stream of these, quote, off-the-record conversations, as opposed to hauling everybody in court, so to speak, with a court reporter each time the judge is in. In other words, just context of whether there was something untoward about the conversations, or whether it was just part of the process in which the arbitrator proceeded along, and it just ends up this way. Do you follow what I'm saying? I do, Chief Judge Stewart, and ultimately this was at the very end of the process, after all of the evidence was in, after the parties had made all of their arguments, after the arbitrator had tried to narrow the issues, and essentially what the arbitrator was saying was, what is left for me to decide? What do I need to decide? And to better understand what the party's positions were on those issues, whether that required additional briefing, whether it was covered by the pre-hearing briefs that the parties filed, but it was an off-the-record discussion after all the evidence was in to really... Nobody in the meeting said, well, Your Honor, I think we need to put on a witness about this, or we need to have a hearing, or we need the court reporter, or, you know, we need to do something else to more formalize this. Is that fair? That is fair, Your Honor, because all of the evidence was in and the transcript reflects that the parties were very careful to make sure all the evidence was in at that point. From the time the March 30 hearing began until the hearing closed after the off-the-record discussion, the entirety of the hearing was about 30 minutes. And this was the last effort by the parties to try to narrow the issues and determine what, in an expedited arbitration, the arbitrator needed to decide in order to resolve the issue. That was the point of the off-the-record. Thank you. That helps. Any other questions from the panel? All right. Thank you. We have your argument. Mr. Katzenbach, you're back up on rebuttal. On the due process point, I would direct your attention to page 363 of the transcript where the off-the-record part begins is initiated by a comment by Mr. Rossetto saying, George, there was a dinner last night of the principals, four people, one from each party, and perhaps, you know, to give you a little context, they can describe whatever ideas came out of that dinner that may be relevant to how to proceed today. Then it was suggested that be off-the-record and then Arbitrator Nikolaos says the following, starting at line 19. Well, is there a way that it can be taken down confidentially? I mean, not be part of the public record? And that is where the due process starts to happen. And unlike a case where you have off-the-record discussions, there's no minute order or on-the-record summary of what occurred. At the end of this, there's simply the judge saying, I guess I don't need post-hearing briefs anymore. On the remedy issue, I know what you're basically saying. I know what your positions are, but no one else does because there's nothing on the record. So it's really quite unlike what I would imagine what normally occurs in a district court in some of the informal case management things. It's more taking evidence or going beyond, I think, telling the Arbitrator how they want to decide it. Of course, this is a quintessential instance of when an issue should have been raised in district court early on so that the district judge, if he had been alerted to this, might have called witnesses to find out exactly what did go on at this off-the-record hearing. But my problem with this is, these parties appear pro se. I'm not even sure they have standing. They did not raise this issue in district court. Now you want us to say, well, the district judge should have given them a chance to amend even though they never even raised the issue to the judge. And now that they have a lawyer, we can go back and call witnesses and resolve this. And it, and I'm not being unkind here, but it reminds me of the old argument of the child who's killed both his parents and then throws himself on the mercy of the court because he's an orphan. I mean, it's just redoing everything simply because the point was never raised. I disagree with the court when saying it wasn't raised but I agree with the court it was not raised specifically. We didn't know the copy of the transcript so that was part of the reason. And while I understand the court's view that is it unreasonable to go back and the cost of doing so, there's also a cost of justice here and a cost of ensuring that an arbitration provision, arbitration proceeding is perceived and is fair. So I don't know that there's a, I guess I know where I come down, I would hope the court would come down in the same way that I would in saying that while it's an regrettable situation, while it's a situation that my clients possibly could have done better, maybe they were prosaic and it was a mistake, I would ask the court to say that, on the other hand, issues of due process and fairness of arbitration on the end are more important in this balance. With respect to the court on standing, if I might just quickly direct your attention to Title 45 Section 184 which talks about the Board of Adjustment in the airline industry and that talks about the switch between an employee or group of employees and a carrier and in the second paragraph that it says it shall be the duty of every carrier and of its employees acting through the representatives selected in accordance with the provisions of this chapter to establish a Board of Adjustment Board of Adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system group or regional boards of adjustment under such authority of Section 153 of this title. 153 is the railroad section. If you look at the railroad section of 153, you'll see that that provision provides specifically for individuals, individual employees to file petitions to review arbitration awards. So I think that when you combine 184 with 153, you'll see that the Congress intended that individuals have the right to standing to appeal and candidly that makes perfectly good sense because remember the whole transportation industry collective bargaining was designed to ensure that there would not be disruptions in transportation services and part of ensuring that is to making sure that employees have the fullest rights not just through their unions but also themselves to ensure that their grievances are met to avoid disruption, to avoid strikes, wildcat strikes, unauthorized strikes because you want to avoid all strikes it's not just strikes sanctioned by the union you want to make sure that the employees feel that their rights are protected so that they will not engage in any of the activity that Congress sought to control in the Railway Labor Act because of the importance of that. Finally, I may have one. I believe we have your opening and your rebuttal argument we appreciate the briefing and argument by both sides in this case.